MORRIS MYERS and PEGGY MYERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Myers v. Commissioner
Docket No. 2557-77.
United States Tax Court
T.C. Memo 1980-437; 1980 Tax Ct. Memo LEXIS 149; 41 T.C.M. (CCH) 83; T.C.M. (RIA) 80437; September 29, 1980, Filed Morris Myers, pro se. Stewart C. Walz, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent deficiencies in petitioners' income tax for the calendar years 1969, 1970, 1971 and 1972 in the respective amounts of $4,168.67, $3,015.23, $43,253.02, and $11,131.09, and additions to tax under section 6653(b), I.R.C. 1954, [1] for *150 these respective years in the amounts of $2,084.33, $1,507.61, $21,626.51, and $5,565.54. By amendment to answer, respondent pleaded in the alternative that if he were not sustained with respect to the additions to tax under section 6653(b) then there was due from petitioners an addition to tax under section 6653(a) for each of the years 1969, 1970, 1971 and 1972 because of negligence, and an addition to tax under section 6651(a) for each of these years because of petitioners' failure to timely file their return. The issues for decision in this case are: (1) The proper amount of petitioners' taxable income for each of the years here in issue computed under a net worth method. [2]
*151 (2) Whether any part of the deficiencies in income tax for each of the years here involved is due to fraud. (3) In the alternative, whether any part of the deficiencies in income tax for each of the years here involved is due to negligence and whether petitioners filed delinquent income tax returns for each of the years here involved without reasonable cause so that the addition to tax under section 6651(a) is applicable. (4) Whether petitioner Peggy Myers is an innocent spouse within the meaning of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Salt Lake City, Utah, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1969, 1970, 1971, and 1972 on February 28, 1972, February 28, 1972, June 19, 1972, and June 19, 1973, respectively. Morris Myers (petitioner) began the practice of law in Aberdeen, South Dakota, in 1957 and was a practicing attorney in Aberdeen throughout the years here in issue. Peggy Myers' father was Mr. Ed Gorder, who was the founder and principal owner of a real estate business *152 which had been in existence for a number of years. Mrs. Myers' brother, R.F. Gorder, also had some interest in the business and worked for the business. Petitioners had a number of business transactions with Mr. Ed Gorder and Gorder, Inc. In addition, petitioner encouraged his mother and father and other relatives to invest money in Gorder, Inc. Petitioner's father was a retired minister of the Congregation Church and his mother a schoolteacher. However, they were quite frugal and for a number of years had made investments in Gorder Company or Gorder, Inc., Mr. Ed Gorder's real estate businesses. In certain transactions between petitioners and Gorder Company or Gorder, Inc. property would be transferred from one to the other, but the property would be retained in the name of the transferee for various purposes such as collection on notes or avoiding assumption of mortgages. Petitioners also owned and operated during the years here in issue a number of rental properties held in their own name. Petitioner, in addition to his practice of law and ownership of rental property, had other business interests during the years here in issue. Petitioner in the course of his practice *153 of law would arrange purchases of property for clients and at times arrange sales of property for clients and hold the note on the property sold in his law office for collection for the client. Prior to May 1970, the accounts in petitioner's law office were kept on daily ledger sheets in the name of each of petitioner's clients. In May 1970, Linda Aman began working for petitioner as secretary, bookkeeper and typist. Ms. Aman set up a cash receipts journal and a cash disbursements journal in addition to the individual account sheets in connection with petitioner's law practice. She would post receipts and disbursements to the journals and on individual account sheets. Ms. Aman devised the method of bookkeeping she used on her own initiative and was not instructed by petitioner as to how to keep the records. When Ms. Aman received money in the mail, such as legal fees due to petitioner, she would enter the transaction in the receipt book and later transfer the entry to the cash receipts journal. She would also note the transaction on the individual client's ledger sheet. Ms. Aman would deposit funds received through the mail to petitioner's bank account. Ms. Aman also posted *154 collections on notes, rental payments, and other items to various records in the office. However, the records with respect to the various rental properties were in very poor order and were inaccurately kept. If a client paid a fee directly to petitioner, he, in most instances, would inform Ms. Aman of the transaction. However, if he overlooked giving Ms. Aman the proper information the fee would not be entered on the records since she would have no way of knowing about the fee. In the latter part of 1968, petitioner began to doubt the financial stability of Gorder Company and Gorder, Inc. and his father-in-law, Mr. Ed Gorder. He requested a financial statement from Mr. Gorder and received a statement showing a net worth of the Gorder interests of over $1 million. However, he doubted the validity of this statement and began to look into the worth of the Gorder interests. In the meantime, he became very concerned with respect to the investments his family had made in the Gorder Company. He felt personally responsible for seeing that they did not lose on these investments. One of the transactions which involved petitioner's family dealt with some property at Rapid City, South *155 Dakota. This property had initially been owned by two of petitioner's aunts. At one juncture this property was put into petitioner's name for the purpose of management and later for sale, and receipts from this property were invested in Gorder Company on behalf of petitioner's relatives. At certain times petitioner considered that he owed his relatives varying amounts from collections from this property. The following schedule shows in total the value of assets both parties agree were owned by petitioners as of the dates indicated: [3]
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Assets
1968
1969
1970
1971
1972
Total Cash
on Hand
$ 100.00
$ 100.00
$ 100.00
$ 100.00 100.00
Total Cash
in Banks
5,972.58
1,663.97
(10.05)
6,869.39
5,317.95
Total Certificates
of Deposit
4,200.00
4,200.00
4,900.00
200.00
0
Total Costs
of Stocks
0
2,572.50
3,152.47
2,689.97
1,879.97
Agreed Notes
Receivable
17,940.10
14,703.20
12,099.70
10,759.20
5,531.51
Total Costs of
Equipment &
Vehicles
6,564.82
9,654.82
11,562.62
19,295.57
16,445.57
Agreed Cost Basis
of Real Estate
and Rental
Property
110,007.06
162,105.04
172,261.25
164,671.51
155,571.51
Agreed Other
Assets *
0
0
0
2,504.19
34,327.00
Total
144,784.56
$194,999.53
$204,065.99
$207,089.83
$219,173.51
*156 * It is not clear from the stipulation whether the following is intended to be included in this category: Dec. 31
Dec. 31
Dec. 31
Dec. 31
Dec. 31
1968
1969
1970
1971
1972
Rental
Enterprises
$139.95
$168.56
$7,775.00
$7,744.38
$5,367.00
We have not included this asset as an asset the parties agree was held by petitioners. Petitioners had numerous accounts and notes payable at December 31 of each of the years 1968 through 1972. The agreed total amounts of such notes and accounts payable are: [4]
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1968
1969
1970
1971
1972
$146,379.22
$169,891.97
$165,797.75
$123,452.49
$87,770.89
*157 In 1971, Mr. Ed Gorder died. He was about 81 years old at the time of his death. After his death, the poor financial condition of his real estate businesses became public knowledge. His son, R.F. Gorder, was totally unable to manage the business. In 1972, the Gorder Company and Gorder, Inc. were declared involuntary bankrupts pursuant to a petition filed by creditors. In 1971, petitioner became concerned about the investment his relatives had in Gorder Company and Gorder, Inc. Petitioner and R. F. Gorder discussed this situation and investigated some of the properties held by Gorder Company to determine whether there were assets from which petitioner's relatives might be paid. It was highly questionable whether there were such assets. Mrs. Myers discussed the problem of the investment of petitioner's family in Gorder Company with Mrs. Gorder, her mother. Mrs. Gorder was approximately 80 years old at the time and not in the best of health. Mrs. Myers made an arrangement with her mother for the transfer of the property at 101 Elizabeth Drive, Aberdeen, South Dakota, which was her mother's home, either into Mr. Myers' name or into the name of Mr. and Mrs. Myers. It was the *158 understanding that the property would be held by petitioners with Mrs. Gorder using the property as long as she lived or wanted to use the property. After Mrs. Gorder no longer wished to use the property or after her death, the property would be sold and petitioner's relatives reimbursed for any losses they may have sustained from investments in Gorder, Inc. Mrs. Gorder also transferred the personal property located in 101 Elizabeth Drive to petitioners with the same understanding. The deed to the property was signed by Mrs. Gorder at her home. Later the document was notarized by Ms. Linda Aman, who did not actually witness Mrs. Gorder's signature to the deed. No money whatsoever was paid by either petitioner to Mrs. Gorder in connection with the transfer of the property at 101 Elizabeth Drive. Some time following the year 1972, other children of Mrs. Gorder persuaded Mrs. Gorder that petitioners had used undue influence in obtaining her signature to the deed and that her daughter, Mrs. Myers, had kept for her own use moneys Mrs. Gorder had given her during the years to pay bills and other expenses for Mrs. Gorder who, because of physical infirmities, was unable to perform these *159 services for herself. Mrs. Gorder then brought a suit for recision of the deed and for return of funds by Mrs. Myers which she alleged Mrs. Myers had misappropriated.This suit never went to trial, but was settled by petitioners transferring the property at 101 Elizabeth Drive back to Mrs. Gorder and Mrs. Gorder dropping the suit for return of funds by Mrs. Myers. The property at 419 North Congress Street was purchased by petitioner from the Gorders prior to 1969 on a contract of sale which was never recorded. In 1969, petitioner sold the property but got it back by foreclosure because of nonpayment of the purchase money note by the purchaser. The basis of petitioner in this property at 419 North Congress Street for each of the years 1968 through 1972 was $2,500. In 1972, R. F. Gorder, Mrs. Myers brother, owed a note in the amount of $9,566 to the Aberdeen National Bank, Aberdeen, South Dakota. The note was secured by the pledge of shares of common stock of Huck Finn Corporation, a Minnesota company. The Huck Finn stock was needed by the Gorder Company, R. F. Gorder, and Gorder Investment Corporation to pay three individuals who were threatening to file suit against the Gorder *160 Company and R. F. Gorder. The final payment of about $9,500 was received on the Rapid City, South Dakota, property which was held in petitioner's name for the benefit of his relatives in 1972. This $9,500 was used to pay the note of R. F. Gorder at the Aberdeen National Bank in order to obtain the shares of Huck Finn common stock which was pledged as security for that loan. The Huck Finn stock was then sold to satisfy creditors of Gorder Company who were threatening to sue the company. No indebtedness of R. F. Gorder to petitioner resulted from this transaction. Prior to 1967, petitioner was representing a woman in a divorce proceeding and arranged with his father-in-law, Mr. Gorder, to sell her a house in Watertown on a land contract. Later the woman received an inheritance and paid on the contract and brought the payments current. She moved from the house in Watertown and petitioner arranged to sell the house for her to a Mr. James Thiery. In connection with the transaction, Mr. Thiery gave petitioner a note for $20,818.97 which petitioner held for collection for the woman who owned the house. The house was located at 109 Church Drive. While the payments on the house *161 and collection on the note were handled through petitioner's office, he had no personal interest in the house or the note. In 1959, petitioner and his wife purchased a house at 1705 South 1st Street. They placed a Veterans' Administration mortgage on the house. In 1962 or 1963, petitioners purchased through Mrs. Myers' father, Mr. Gorder, a larger house on the north side of Aberdeen. They transferred the house at 1705 South 1st Street to Mr. Gorder as a downpayment on the larger house they acquired as their home and obtained a $20,000 loan from the Aberdeen Federal Savings and Loan to pay the balance on that house. Initially the house at 1705 South 1st Street which petitioners had transferred to Mr. Gorder was rented to Mr. L. E. McKay, and later Mr. and Mrs. McKay purchased the house. The sale to Mr. McKay was under a contract for deed and at least some of the payments on the note were used to pay the mortgage insured by the Veterans' Administration which petitioner and his wife had initially placed on the house. During all the years here in issue petitioner and Mr. Willis Wetzler engaged in various joint business transactions. In connection with one of these transactions, *162 they held a note jointly from Mr. Ben Kraft which had a total balance at December 31, 1971, of $3,730.56 and at December 31, 1972, of $3,796.04. Petitioner's interest in this note was one-half, or $1,865.28 at December 31, 1971, and $1,898.02 at December 31, 1972. Another transaction between petitioner and Mr. Wetzler involved the Capitol Lounge. Petitioner's interest in the note covering the sale of the Capitol Lounge was $1,000 as of December 31, 1969, $3,081.15 as of December 31, 1970, and $7,901.15 as of December 31, 1971. Petitioner held no notes receivable from R. F. Gorder or the Gorder Company during the years 1968 through 1972. In 1972, petitioner exchanged a 1968 Pontiac automobile which he owned for a diamond ring which had a value of $500. At December 31, 1968, petitioner owned an interest in a note receivable in the name of Bernard Riedl in the amount of $8,250. During the taxable year 1970, petitioner was handling a divorce action for Jeanette Zick.In connection with that action he held certain bonds that belonged to Mrs. Zick. Mrs. Zick accused petitioner of misappropriating her bonds and on August 3, 1970, petitioner paid Mrs. Zick $3,418.10, keeping *163 $617.50 out as his fee. In 1972, petitioner was indicted for embezzlement with respect to this transaction. In connection with this indictment, petitioner was required to post a $5,000 bond. Petitioner borrowed the $5,000 to use for posting the bond from Nancy Brady. Subsequent to December 31, 1972, when the $5,000 posted as a bond was released, it was paid over to Nancy Brady in discharge of the loan. Petitioner in 1973 was tried by a jury and convicted on the embezzlement charge of misappropriating $4,035.60 of bonds belonging to Mrs. Zick. After his conviction, he was disbarred. During the later years here in issue petitioner began drinking heavily and was not often in his office. Petitioner employed a CPA firm to prepare his tax returns for the years 1969 through 1972. The firm was engaged to prepare the 1969 and 1970 returns sometime after those returns were due to have been filed. They were engaged to prepare those returns and began work on them around September 1971. The accountant assigned to the returns obtained petitioner's records from his secretary-bookkeeper, Ms. Aman. Ms. Aman furnished the accountant will all records he requested. However, the records *164 with respect to petitioner's real estate transactions were in very poor shape. When the accountant could not determine the nature of some transactions from the records Ms. Aman had, he would make an appointment with petitioner. Petitioner was cooperative with the accountant and furnished the accountant with everything he requested.The accountant inquired of petitioner with respect to certain fees that did not appear directly on the books but otherwise assumed that all of petitioner's fees were shown on petitioner's books. In 1971, petitioner had handled a matter for the Gengerke Trust. He was due an attorney's fee for handling this which was to be paid to him by a bank. The bank drew the check to petitioner but did not actually give it to him, rather requiring that petitioner endorse the check to be applied on a loan that he had at the bank. The $4,500 attorney's fee did not get listed on petitioner's records and did not otherwise get included in the income reported on his tax return for 1971. In 1970, petitioner represented Mr. Willis Wetzler in a transaction that ultimately resulted in Mr. Wetzler's acquisition of the Lone Pine Trailer Court.The property was purchased *165 by Mr. Wetzler for $36,000, but the owner of the property agreed to accept for the property the balance due on a contract. The difference between the $36,000 and the balance due on the contract was $5,750. This amount was considered by petitioner and Mr. Wetzler to represent petitioner's legal fee for work done by petitioner for Mr. Halverson who had been the prior owner of the trailer court. Petitioner throught that he and Mr. Wetzler had explained this transaction to petitioner's accountant when the accountant was working on petitioner's 1970 income tax return. Petitioner's accountant did not remember petitioner explaining the trailer court situation to him and was of the opinion that the fee petitioner received in connection with the trailer court transaction did not get included in petitioner's income as reported on his 1970 return. In 1969, petitioner received a 1967 Toyota from Kemp Drury in payment for a legal fee. Petitioner did not get a title to the Toyota and he did not consider it to have any value. However, in 1972 he did make an arrangement to trade the Toyota on a recreational vehicle. The value of the Toyota was not included in petitioner's income as reported *166 for either 1969 or 1972. There were a number of properties or other type transactions in which petitioner received property or an interest in property as a fee. When petitioner's accountant asked petitioner about these transactions he received the information asked for. The accountant included all the amounts on the returns prepared for petitioners which he determined from petitioner's records and other information he received to constitute income of petitioners. Petitioner gave full information to his accountant regarding any items with respect to which the accountant requested information. Some information on petitioner's tax return was obtained by the accountant from prior returns, and some information with respect to property was obtained from the records kept by Ms. Aman. Certain amounts were improperly included in the returns as income to petitioners which were in fact amounts collected by petitioner for others. Depreciation on some properties which petitioner was holding and renting for other persons was deducted on some of petitioner's returns. Since the transaction with respect to 109 Church Drive was handled by petitioner in behalf of a client, the following notes *167 payable are not properly includable in petitioners' liabilities in computing their net worth: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1968
1969
1970
1971
1972
Aberdeen Federal
Savings & Loan
#1983
$8,977.16
$8,795.21
$8,301.70
$ 0
$ 0
#1983-B
303.65
238.35
122.48
0
0
#1983-C
0
0
2,721.69
0
0
Gerald Harris
0
0
7,358.34
0
0
Since petitioners were not the equitable owners of the property at 1705 South 1st Street, the following notes payable with respect to that property are not properly includable in their liabilities in computing their net worth: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1968
1969
1970
1971
1972
Gorder Co.
#1565
$ 2,150.32
$ 1,850.32
$1,702.02
$1,564.50
$1,564.50
Veterans Admin.
10,958.38
10,606.38
9,991.47
9,552.63
9,090.21
Mrs. Myers had no connection with petitioner's office and his practice of law. However, she did on occasion call petitioner's secretary to get money for household expenses. In addition to the home they owned in Aberdeen, petitioners had a small cottage on a lake. Mrs. Myers had a station wagon which she used personally *168 and for transporting petitioners' five children to various places. Two of petitioners' five children were in school in 1969 and the others were preschool age. The family lived very frugally. Their living expenses, not counting any work done on their house, such as painting, or amounts which petitioners spent on such activities as drinking, were approximately $15,000 in 1969 and $16,000 in 1970, 1971, and 1972. When petitioner first became aware of the financial condition of the Gorder real estate interests in 1968 or 1969, he told his wife that he was going to call the notes due to members of his family. However, Mrs. Myers prevailed upon him not to do so. At about this time petitioner began to drink to such an extent that he neglected his law practice, and by 1972 petitioner had developed a serious drinking problem. This drinking problem continued after petitioner was indicted for embezzlement on October 2, 1972. Mrs. Myers did not examine the joint Federal income tax returns which were prepared by the accountant engaged by petitioner at the time she signed them. Respondent in his notice of deficiency computed petitioners' income on a net worth basis. ULTIMATE FINDINGS *169 OF FACT 1.Petitioners did not have as assets a note from R. F. Gorder at December 31, 1972, in the amount of $9,566; a note from Mr. Thiery of $20,818.97 as of December 31, 1970; notes from Mr. McKay in the amounts of $13,084.09, $11,811.35, $10,446.94, $14,215.52, and $13,434.42 as of December 31, 1968, 1969, 1970, 1971, and 1972, respectively. Petitioners' interest in the Ben Kraft note at December 31, 1971 and 1972 was $1,865.28 and $1,898.02, respectively. 2. Petitioners had an interest in the Capitol Lounge in the amounts of $1,000, $3,081.15, and $7,901.15 at December 31, 1969, 1970, and 1971, respectively; and petitioners have failed to show that they did not have an interest in the Gas Lite Bar and Building in the amounts of $3,000, $8,565.84, $12,285.11 and $10,652.67 as of December 31, 1969, 1970, 1971, and 1972, respectively. 3. Petitioners did not own notes receivable from R. F. Gorder or the Gorder Company in the amount of $32,822.75 at December 31, 1968, 1969, 1970, 1971, or 1972.
4. Petitioners did own a diamond ring with a basis of $500 at December 31, 1972. 5. Petitioners did not own property at 101 Elizabeth Drive at December 31, 1971 and 1972 of *170 a value of $42,000, and did not own the property at 109 Church Drive at December 31, 1968 and December 31, 1969. 6.Petitioners owned property at 419 North Congress Street at December 31, 1968, 1969, 1970, 1971, and 1972 with a cost basis of $2,500. 7. Petitioners owned a note from a Mr. Lang in the amount of $3,981.08 at December 31, 1972, and an interest in a note from Bernard Riedl at December 31, 1968, in the amount of $8,250 rather than $16,500. 8. Petitioners did not own the $5,000 bail bond at December 31, 1972, since it was equitably owned by the person who put up the money for the bond. 9. Petitioners were not equitably obligated on the notes payable with respect to the property at 1705 South 1st Street or the property at 109 Church Drive at December 31 of any of the years here in issue. 10. Petitioners had total personal and family living expenses of $20,000 for the year 1969, $21,000 for each of the years 1970 and 1971, and $23,000 in 1972. 11. No part of the underpayment of tax by petitioners for any of the years here in issue was due to fraud. 12. A part of the underpayment of tax for each of the years here in issue was due to negligence. *171 13. Petitioners did not have reasonable cause for failure to timely file their tax returns for 1969 and 1970, but respondent has not established that petitioners' failure to timely file the 1972 and 1973 returns was not due to reasonable cause. 14. Petitioner Peggy Myers has failed to show that she did not know, or have reason to know, of the understatement of income on petitioners' joint returns. OPINION The issues in this case are purely factual. The record is clear that petitioners' books and records were totally inadequate and that their income could not reasonably be computed from their books. Since petitioners' position here has been primarily that there were errors in the net worth computation, they apparently do not contend that an adequate computation of their income could be made from their books and records. Most of petitioners' assets and liabilities have been stipulated.Of the contested items, we have found that petitioners were not the equitable owners of the property at 101 Elizabeth Drive in 1971 and 1972, that petitioners did not own a note from R. F. Gorder or a note from Mr. Thiery of Mr. McKay, and that they had only a half interest in the Ben Kraft *172 note. We have also found that petitioner did not own any notes from R. F. Gorder or the Gorder Company in any of the years here in issue. However, apparently respondent has conceded the latter item. We have found that petitioner did not equitably own the $5,000 bond at December 31, 1972. If he technically owned this bond, it would be necessary to include in his liabilities the offsetting debt. Respondent conceded on brief that if petitioner owned the $5,000 bond his liabilities at December 31, 1972, should be increased by the $5,000 indebtedness to the person who advanced the money for the bond so that the item would be a "wash." Petitioner contends he did not own the Lang note with a value of $3,981.08 at December 31, 1972. However, we do not find factual support for this contention in the record. We have therefore concluded that petitioner has failed to establish that he did not own the Lang note at December 31, 1972. We have concluded that petitioner owned the property at 419 North Congress Drive at December 31 of each of the years 1968 through 1972 with a value of $2,500. We have considered all the items which were questioned by petitioners on the record. It may be *173 that there are other items with which petitioners do not agree that are not covered by the stipulation of the parties, but if so we sustain respondent's inclusion of these items in petitioners' assets because petitioners have failed to establish to the contrary. We have accepted the liabilities as shown by respondent in the statutory notice except for the adjustments we have found may be necessary because petitioners were not the equitable obligors on the mortgage notes on properties they did not equitably own, and the adjustments necessary to depreciation reserves because petitioners did not own the properties at 109 Church Drive, 101 Elizabeth Drive, and 1705 South 1st Street. Petitioners contest the amount of personal living expenses determined by respondent. Respondent determined these personal living expenses by considering all checks from all petitioners' bank accounts that could not be placed as going for another purpose as being personal living expenses, and in addition added $7,360.45 in 1969, $9,406.41 in 1970, $12,238.53 in 1971, and $17,668.42 in 1972 of items which he listed as personal expenses charged to various accounts, interest on personal residence, contributions, *174 nondeductible promotional expenses, automobile expenses, depreciation, and loss on sale of automobile, and in the year 1972 an amount of 1971 income tax. In our view, the logical assumption is that a number of the expenses which respondent added to the total amount of checks which he could not identify as being for business purposes would have gone for the items respondent again added to petitioners' personal living expenses. Also, it is far from clear on this record that some of the funds from these checks were not used to pay business expenses. Becuase we conclude that respondent's method of computing petitioners' personal living expenses is subject to many inaccuracies, we have decided to accept the estimate made by Mrs. Myers of family living expenses of $15,000 in 1969 and $16,000 for each of the years 1970, 1971 and 1972. We recognize, as did Mrs. Myers, that certain items, such as the painting of their home in one of the years here in issue, were not included in this estimate of living expenses. However, it would appear that such items as interest on the mortgage on their home, utilities paid for their home, contributions and real estate taxes, and automobile expenses *175 would be included in this estimate. Also, apparently Mrs. Myers' estimate did not include amounts expended by petitioner that she would consider to be outside the normal family living expenses. Such items would include amounts spent by petitioner on his drinking habit and other personal items paid by petitioner not connected with the household living costs. Considering this record as a whole, we have concluded that in addition to amounts estimated by Mrs. Myers as petitioners' personal living expenses, they expended on person living $5,000 in each of the years 1969, 1970, and 1971, and $7,000 in 1972. The $7,000 in 1972 includes the amount of 1971 income tax paid in that year. On this basis, we have determined that petitioners had personal living expenses of $20,000 for 1969, $21,000 for each of the years 1970 and 1971, and $23,000 for 1972. Since the issue of what assets petitioners owned is purely factual, we need add little to our findings of fact in support of the conclusions we have reached. However, it should be pointed out that respondent does not contend that petitioners paid anything to Mrs. Gorder for the transfer of 101 Elizabeth Drive. Respondent effectively argues *176 that 101 Elizabeth Drive was property petitioners obtained by false pretenses. Respondent's argument is primarily based on the fact that Ms. Aman, when she notarized Mrs. Gorder's signature, did not actually see Mrs. Gorder sign the deed. However, the record is clear that Mrs. Gorder did sign the deed. Both Mrs. Myers and petitioner testified that this property was transferred to petitioners' names as a protection for indebtedness of Gorder, Inc. to members of petitioner's family and that in effect petitioners held this property in trust as long as Mrs. Gorder chose to live in the house. Mrs. Myers testified that she talked to her mother and made the arrangements for the transfer with this understanding. We have therefore concluded on the basis of the record that petitioners were not the equitable owners of 101 Elizabeth Drive at either December 31, 1971, or December 31, 1972. At approximately the time of the filing of his brief in this case, respondent filed a motion for leave to file an amendment to answer, alleging that as of December 31, 1968, petitioners' interest in a note made by Bernard Riedl was $8,250 rather than the $16,500 included by respondent in the net worth statement *177 and claiming an increased deficiency for 1969 because of this adjustment. Petitioners objected to the granting of this motion, and we have delayed action on respondent's motion until consideration of the case. The record shows that petitioner testified that he owned only a one-half interest in the Bernard Riedl note. We therefore have granted respondent's motion to amend his answer, although it is not clear that the change in the value of this asset held by petitioners at December 31, 1968, will in fact result in any increased deficiency in petitioners' tax for the year 1969. Because there is no evidence to the contrary, we have accepted the nontaxable portion of long-term capital gains and the nontaxable items and itemized deductions and exemptions as determined by respondent in the notice of deficiency. However, if in fact any of the capital gains result from purported sales of items which we have held were not assets equitably owned by petitioners, a proper adjustment should of course be made. On this basis of this record, we conclude that respondent has failed to show that any part of any deficiency for any year here in issue was due to fraud. The record shows that petitioner's *178 books were poorly kept and that petitioner was drinking excessively and not supervising the bookkeeping in his office as he should have during the years here in issue. In fact, the certified public accountant who prepared petitioners' tax returns referred to petitioner's records with respect to real estate transactions as a "nightmare." However, the record shows that petitioner turned over all records he had to the accountant who prepared his returns and gave any information to the accountant that the accountant requested. The record shows no attempt by petitioner to conceal records or information from the agent investigating his returns or from the Revenue Service. Respondent's primary argument in support of his fraud determination is that certain legal fees received by petitioner were not shown on his books and not included in his taxable income as reported. The record is far from clear that all these fees were not included in petitioner's reported income. In addition, the record is not clear that in some instances petitioner did not inform his accountant about the transactions resulting in the fees, so if the fees were not included as income it was because the account did not *179 get a clear understanding that the fee was income to petitioner. Petitioner testified that since he believed he had given the accountant all his records, he merely accepted the returns as prepared by the accountant without carefully reviewing them. Petitioner testified that he did not personally check to see if all items of income were included. On the basis of this record, we conclude that respondent has failed to establish by clear and convincing evidence that any part of petitioners' underpayment of tax for any of the years here in issue was due to fraud. Our discussion with respect to the nature of petitioner's books and records in connection with disposition of the fraud issue makes it clear that in our opinion a part of petitioners' underpayment of tax in each of the years here in issue was due to negligence. Respondent in the alternative affirmatively alleged that petitioners were liable for the addition to tax under section 6653(a). Respondent has the burden of proof with respect to the addition to tax for negligence since this issue was raised by an affirmative allegation in his answer. However, the evidence here is ample to sustain respondent's burden with respect *180 to the negligence addition to tax for each year here in issue. By affirmative allegation in the alternative, respondent also claimed the addition to tax under section 6651(a) for failure of petitioners to timely file their returns. Again, since this issue is raised by respondent in his answer, the burden of showing that the additions to tax are due is on him. Respondent has shown that the returns for each of the years 1969 and 1970 were filed on February 28, 1972. The record shows that petitioner did not even engage the certified public accountant to prepare these returns until after their due date. Petitioner's only explanation is his lack of attention to his business affairs resulting from his excessive drinking. In this state of the record we conclude that respondent has established that petitioners' return for each of the years 1969 and 1970 was untimely filed and that the untimely filing was not due to reasonable cause. The situation with respect to the 1971 and 1972 returns is different. The record shows that for each of these years the accountant was timely engaged to prepare the returns and applied for an automatic extension of time within which to file the returns *181 to June 15. The accountant testified that he applied for such an extension for the 1971 return, and a copy of the application is attached to the copy of the return received in evidence. The accountant did not testify as to applying for an extension of time to file the 1972 return. However, the copy of the 1972 return received in evidence as a joint exhibit has a copy of an application for such an automatic extension attached to it. The 1971 return bears, next to the name of the certified public accountant, the date of June 12, 1972, and the 1972 return bears the date of May 31, 1973. No date appears next to the signature of either petitioner. It would appear that a document mailed from Aberdeen, South Dakota, on June 15 might well not be received at Ogden, Utah, until June 19. June 15, 1972, was a Thursday and June 15, 1973, was a Friday. The burden is not on petitioner here to show that the 4-day late filing was due to reasonable cause but rather on respondent to show that it was not. Under the facts here, we conclude that respondent has failed to show that the late filing of the 1971 and 1972 returns was not due to reasonable cause. [5]
*182 The final issue is whether Mrs. Myers has shown that she should be relieved of tax under section 6013(e) as an innocent spouse. Mrs. Myers testified that she did not look over the returns but merely signed them. In fact, both petitioners testified that they relied on the accountant and did not really review the returns. While the record shows that Mrs. Myers took no part in petitioner's law practice, it is clear that she did participate in real estate transactions. The record shows that Mrs. Myers had discussions with her husband relative to many real estate transactions. In fact, she was the one who arranged with her mother to transfer the property at 101 Elizabeth Drive to petitioners to protect indebtednesses to certain of her husband's relatives. Mrs. Myers also testified that when her husband first became suspicious of the financial condition of Gorder, Inc., she had persuaded him not to bring any action against the company. The record shows that both petitioners were involved in transactions with the Gorder Company or Gorder, Inc. Considering this record as a whole, we conclude that Mrs. Myers has failed to show that she did not have reason to know of the omission of *183 income from the returns. She had a duty to look at the returns before she signed them, and her testimony that she did not is insufficient to establish that she should not reasonably have known of the omissions. It is not clear from this record that in fact there was in each year here in issue an omission from gross income in excess of 25 percent of the amount of gross income shown on the return. An increase in tax liability because of disallowance of improper deductions does not cause the provisions of section 6013(e) to apply. Furthermore, the stipulated facts show that some of the assets included in the net worth computation on the basis of which petitioners' income was determined belonged to Mrs. Myers. Some of these assets were certificates of deposit, real estate and notes receivable. Such assets are the type which generate income. It is therefore not clear from this record that all the omitted gross income should necessarily be attributable to Mr. Myers. The inference from the record is to the contrary. On the basis of this record, we conclude that Mrs. Myers has failed to show that she is an innocent spouse within the provisions of section 6013(e). Decision will *184 be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Most of the assets and liabilities of petitioners as of December 31 of each of the years 1968, 1969, 1970, 1971 and 1972 were stipulated, leaving in issue only the following items: (1) Whether petitioners owned property at 109 Church Drive, Aberdeen, South Dakota, with a cost basis of $18,500 as of December 31, 1968, and December 31, 1969, and a note receivable from James Thiery in the amount of $20,818.97, in connection with the purchase of this property at December 31, 1970. (2) Whether petitioners owned a note receivable from L.E. McKay in the respective amounts of $13,084.09, $11,811.35, $10,446.94, $14,215.52, and $13,434.42 as of December 31, 1968, 1969, 1970, 1971, and 1972. This note is related to property at 1705 South 1st Street, which petitioners contend was sold to either the Gorder Company or Mr. Ed Gorder in connection with the purchase of the home in which petitioners lived throughout the years here involved and for a while thereafter. (3) Whether petitioners owned a note receivable in the name of Bernard Riedl in the amount of $8,250 or $16,500 as of December 31, 1968. (4) Whether petitioners owned a note receivable from Ben Kraft in the respective amounts of $3,730.56 and $3,796.04 as of December 31, 1971, and December 31, 1972, or in the amounts of $1,865.28 and $1,898.02 as of those respective dates. (5) Whether petitioners owned a note receivable from J.C. Brown and the Capitol Lounge in the respective amounts of $1,000, $3,081.15, and $7,901.15 as of December 31 of the years 1969, 1970, and 1971. (6) Whether petitioners owned a note referred to as the Lang note in the amount of $3,981.08 as of December 31, 1972. (7) Whether petitioners owned a note receivable from R.F. Gorder in the amount of $9,566 as of December 31, 1972. (8) Whether petitioners owned rental property at 419 North Congress, Aberdeen, South Dakota, with a cost basis of $2,750 as of December 31, 1970, or owned this property throughout the entire period here involved with a cost basis of $2,500. (9) Whether petitioners owned a diamond ring with a cost basis of $500 at December 31, 1972. (10) Whether petitioners owned a bail bond with a cost basis of $5,000 and, if so, was this asset offset by a note payable to Nancy Brady of $5,000 as of December 31, 1972. (11) Whether petitioners had an interest in the Gas Lite Bar and Building with a cost basis in the amounts of $3,000, $8,565.84, $12,285.11, and $10,652.67 as of December 31 of the years 1969, 1970, 1971, and 1972, respectively. (12) Whether petitioners owned real property at 101 Elizabeth Drive, Aberdeen, South Dakota, with a cost basis of $42,000 as of December 31, 1971 and 1972. (13) The amount of petitioners' personal living expenses for each of the years 1969, 1970, 1971, and 1972. Respondent, in the statutory notice, determined petitioners' total liabilities as follows: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1968
1969
1970
1971
1972
Accounts and
notes
payable
$189,304.03
$217,900.33
$233,306.86
$177,473.32
$171,542.10
Reserve for
depreciation
16,857.69
23,875.98
31,062.09
36,491.72
38,670,60
It is not clear whether these accounts and notes payable include notes with respect to 109 Church Drive and 1705 South 1st Street. If so, these notes are not liabilities of petitioners if petitioners were not in fact the owners of these properties. Also, the reserve for depreciation would require adjustment for any rental properties respondent included in the net worth statement that are determined not to be owned by petitioners.↩
3. The details of each asset making up the totals is contained in the stipulation of facts and, since we have found the facts as stipulated, is not repeated here.↩
4. The details of these notes and accounts payable are stipulated and have therefore been found as fact since we found the facts as stipulated. The total of petitioner's liabilities for each of the years here in issue as set forth in the statutory notice of deficiency is greatly in excess of the amounts of these notes payable agreed to by both parties. See n. 2.There is no evidence explaining the difference in the liabilities as set forth in respondent's statutory notice and the total of the notes and accounts payable stipulated other than with respect to certain specific notes which will be discussed later.↩
5. The 1971 return bears a stamp that it was received at Ogden, Utah, on June 19, 1972, and the 1972 return bears a stamp that it was received at Ogden, Utah, on June 19, 1973. Under section 7502, if petitioner had mailed the returns on June 15 they would have been timely filed if a postmark of June 15 showed on the envelope.Under these circumstances, the returns would have been deemed filed on June 15. However, the parties stipulated that the returns in each instance were filed on June 19. This stipulation might be intended to mean that the returns were not mailed by June 15. However, respondent does not discuss this proposition at all in his brief, merely stating that-- The 1971 return was prepared timely but not filed timely. The fault can be only petitioners. The 1972 return was prepared late, but petitioners offered no reason and did not attempt to shift blame to the accountant. Accordingly, respondent has satisfied his burden of proof as to the delinquency penalty for all years. Respondent's witness, petitioner's certified public accountant, testified that the 1971 return was prepared timely because there was an extension of time that year. He testified that he did not know why the 1972 return was not prepared timely. However, there is attached to the copy of the 1972 return filed with the Court a Form 4868, application for automatic extension of time to June 15, 1973, filled out and at the bottom checked as being filed by "A certified public accountant duly qualified to practice in * * * South Dakota." No signature appears on this application as did on the 1971 application. However, obviously the original application would have been in respondent's files and the copy attached to the return may well have been an unsigned copy. At least, respondent at the trial made no explanation with respect to the 1972 return and the accountant gave no explanation of why he would not have signed the return until May 31, 1973, if an automatic extension had not been requested.↩